IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| CEARA WOODY, MICHAEL WOODY, TEMPEST HORSLEY, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 3:17-cv-00534-SMY-RJD |
| CITY OF GRANITE CITY, ILLINOIS, STEVE WILLAREDT in his individual and official capacity, JOHN BIRDSONG, in his individual and official capacity, DAVID HENN, in his individual and official capacity, RALPH WALDEN, in his individual and official capacity, CAPT. GAGICH, in his official capacity, LT. WERTHS, in his official capacity, PT. MANGIARACINO, in his official capacity PT. DONAHEY, in his official capacity SERGEANT WOJITOWICZ, in his official capacity PT. HADLEY, in his official capacity, PT. ROBERTS, in his official capacity | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**Plaintiff's Response to Defendants' Motion for Summary Judgment as to Counts I and II**

COME NOW Plaintiffs, by and through their counsel, and state as follows:

**I.    Plaintiffs Have Sufficient Evidence to Withstand Summary Judgment With Respect to Counts I and II**

  **A.    Legal Standard**

Summary judgment is precluded if there is a genuine dispute as to a material fact, or if the movant does not show that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A summary judgment will only be affirmed if, "viewing the facts in the light most favorable to the [nonmovants], and drawing all reasonable inferences in their favor, we conclude that no material issue of fact is disputed and that [the defendants] are entitled to judgment as a matter of

1

law." *Malen v. MTD Products, Inc.*, 628 F.3d 296, 303 (7th Cir. 2010). "In applying this standard we draw all reasonable inferences and resolve factual disputes in favor of the nonmoving party." *Id.* "At summary judgment a court may not assess the credibility of witnesses, choose between competing inferences or balance the relative weight of conflicting evidence …" *Abdullahi v. City of Madison*, 423 F.3d 763, 769 (7th Cir. 2005).

      **B.**      **Applicable Law as to Municipal Liability**

There are multiple ways in which a municipality can be found liable under Section 1983. It can be held liable if it is determined an "official policy, widespread custom, or action by an official with policymaking authority" was the "moving force behind a constitutional violation. *Monell v. Dept. of Social Services of City of New York*, 436 U.S. 658, 690 (1978). It can also be held liable for a failure to train its employees so that they do not violate constitutional rights:

> But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

*City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989)

A municipality can also be held liable for failing to have sufficient policies in place to prevent violations of constitutional rights. Most of Defendants' authority predates the Seventh Circuit's *en banc* decision in *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 382 (7th Cir. 2017), which held that allegations a defendant failed to have sufficient policies in place were sufficient to state a *Monell* claim, even though the plaintiff did not identify any prior similar occurrences arising from the failure to promulgate policies. Many post-*Glisson* decisions from the district courts within the Seventh Circuit have denied dispositive motions. Further, much of Defendants' authority does not even involve claims about failures to promulgate rules and

2

policies. Because the more recent authority that is closest to what Plaintiff is alleging indicates Plaintiff's allegations are sufficient, Plaintiff requests that the instant motion be denied.

In 2017, the Seventh Circuit, *en banc*, held that allegations regarding the failure to put adequate policies in place are sufficient to survive summary judgment, and noted that holding was consistent with long-standing precedent:

> We are not breaking new ground in this area; to the contrary, this court has recognized these principles for years. In *Sims v. Mulcahy*, 902 F.2d 524 (7th Cir. 1990), we observed that "**in situations that call for procedures, rules or regulations, the failure to make policy itself may be actionable**." *Id.* at 543 (citing *Avery v. Cnty. of Burke*, 660 F.2d 111, 114 (4th Cir. 1981); *Murray v. City of Chicago*, 634 F.2d 365, 366–67 (7th Cir. 1980)). In the same vein, we said in *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293 (7th Cir. 2010), that "**in situations where rules or regulations are required to remedy a potentially dangerous practice, the County's failure to make a policy is also actionable**." *Id.* at 303; see also *King v. Kramer*, 680 F.3d 1013, 1021 (7th Cir. 2012) (where municipality has "actual or constructive knowledge that its agents will probably violate constitutional rights, it may not adopt a policy of inaction").

*Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 381 (7th Cir. 2017) (emphasis added).

The Seventh Circuit added that a plaintiff is ***not*** required to allege or prove prior similar incidents to state a claim:

> **Notably, neither the Supreme Court in *Harris*, nor the Ninth Circuit, nor the Third Circuit, said that institutional liability was possible only if the record reflected numerous examples of the constitutional violation in question**. The key is whether there is a conscious decision not to take action. That can be proven in a number of ways, including but not limited to repeated actions. **A single memo or decision showing that the choice not to act is deliberate could also be enough**. The critical question under *Monell* remains this: is the action about which the plaintiff is complaining one of the institution itself, or is it merely one undertaken by a subordinate actor?

*Id.* (emphasis added).

*Glisson* added, "**There is no magic number of injuries that must occur before its failure to act can be considered deliberately indifferent**. *See Woodward v. Corr. Med. Servs.*, 368 F.3d 917, 929 (7th Cir. 2004) ('**CMS does not get a 'one free suicide' pass.**')." *Id.* at 382 (emphasis added).

In *Bohanon v. Reiger*, No. 116CV02117JMSMJD, 2018 WL 447714, at *9–11 (S.D. Ind.

3

Jan. 17, 2018), summary judgment was denied in light of *Glisson* where the plaintiff, as Plaintiff does here, alleged that vague or absent policies led to his injuries:

> A reasonable juror could consider the nature of this risk and conclude that the IMPD made a "deliberate choice" to allow intoxicated officers to decide when it is appropriate to engage and that this policy choice constituted deliberate indifference to the likelihood of inappropriate police intervention. *Glisson*, 849 F.3d at 382. A reasonable jury could also conclude that this policy choice caused Mr. Bohanon's excessive force injuries when the officers mistakenly decided to intervene based upon the belief that Mr. Harper and Ms. Welsh were in danger. "Monell requires no more." *Id.*
>
> As in *Glisson*, the Court is "not holding that the Constitution or any other source of federal law required" IMPD to adopt a particular policy, such as Mr. Bohanon's proposed "zero tolerance" policy. Id. And, returning to the difficulties of proving Mr. Bohanon's claim, the City will be able to introduce evidence at trial to show that G.O. 3.24 was not promulgated with deliberate indifference to the possibility of excessive force incidents. See id. ("At trial, there is no reason why Corizon would not be entitled to introduce evidence of its track record...."). So too will the City be entitled to introduce evidence showing that it was not its policy that caused Mr. Bohanon's injuries, but instead the unreasonable and unnecessary actions of Officers Reiger and Serban, who the IMPD found violated multiple directives. In holding that the City is not entitled to summary judgment on these issues, the Court concludes only that Mr. Bohanon's Monell claim based upon excessive force is not amenable to summary resolution.

*Bohanon v. Reiger*, No. 116CV02117JMSMJD, 2018 WL 447714, at *9–11 (S.D. Ind. Jan. 17, 2018)

In *Shields v. City of Chicago*, No. 17 C 6689, 2018 WL 1138553, at *3–4 (N.D. Ill. Mar. 2, 2018), the court denied a motion to dismiss, and specifically cited Seventh Circuit authority holding federal courts may not apply a "heightened pleading standard" to *Monnell* claims:

> To recover under *Monell*, Plaintiff must eventually show that (1) he suffered a deprivation of a constitutional right; (2) as a result of an express policy, widespread custom, or deliberate act of a decision-maker with final policy-making authority, that was; (3) the cause of his constitutional injury. See *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017). As to the causation element, Plaintiff must offer evidence that the unconstitutional custom, policy, or practice was the "moving force" behind his constitutional injury. See *Daniel v. Cook Cnty.*, 833 F.3d 728, 736 (7th Cir. 2016). At this procedural posture, however, the Court need only determine whether Plaintiff has sufficiently alleged his Monell claim against the City under the dictates of *Iqbal* and *Twombly*. **See *White v. City of Chicago*, 829 F.3d 837, 844 (7th Cir. 2016) (federal courts may not apply a "heightened pleading standard" to *Monell* claims).**

*Id.* at *3.

4

*Shields* rejected the proposition that only alleging a single incident required dismissal:

> In the present motion, the City argues that Plaintiff has failed to adequately allege his *Monell* claim because he only mentions a single incident, namely, the alleged excessive force surrounding his arrest and detention on June 6, 2016. In response, **Plaintiff asserts that he can allege a failure to train claim based on his own experience without alleging other, similar violations. Indeed, the Supreme Court has left open the possibility that in a narrow range of failure to train cases, a plaintiff need not prove a pattern of similar violations to establish deliberate indifference.** See *Connick v. Thompson*, 563 U.S. 51, 63 (2011); *Bd. Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 409 (1997); *Canton v. Harris*, 489 U.S. 378, 390 n.10 (1989); see also *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 929 (7th Cir. 2004) ("The Supreme Court has expressly acknowledged that evidence of a single violation of federal rights can trigger municipal liability if the violation was a 'highly predictable consequence' of the municipality's failure to act."). Outside of this exception, "*Monell* claims based on allegations of an unconstitutional municipal practice or custom—as distinct from an official policy—normally require evidence that the identified practice or custom caused multiple injuries." *Chatham v. Davis*, 839 F.3d 679, 685 (7th Cir. 2016).
>
> **That being said, the Supreme Court's discussions in *Connick*, *Brown*, *Canton*, and the Seventh Circuit's decision in *Chatham* concern proving a failure to train *Monell* claim, not pleading one. *See White*, 829 F.3d at 844. In *White*, the Seventh Circuit recognized the difference in the standards for pleading a *Monell* claim based on a widespread practice or custom and proving one. In doing so, the Seventh Circuit clarified that *Monell* claims are not subject to a heightened pleading standard …**

*Id.* at *3–4 (N.D. Ill. Mar. 2, 2018) (emphasis added)

The Central District of Illinois recently denied a motion to dismiss a *Monell* claim, despite the absence of allegations of prior similar injuries due to the failure to promulgate effective policies:

> As to Plaintiff's *Monell* claims against CHC, CCS, and Sheriff McCoy (hereinafter referred to as the "*Monell* Defendants"), drawing all inferences in Plaintiff's favor—as the Court must do—the Court finds that Plaintiff has sufficiently stated a *Monell* claim against them. *Cf. Estate of Sims ex rel Sims v. County of Bureau*, 506 F.3d 509, 514 (7th Cir.2007) (stating that "a federal court may not apply a heightened pleading standard more stringent than the usual Rule 8(a) pleading requirements" with respect to *Monell* claims).
>
> **Plaintiff does not allege that other suicides have occurred at the Peoria County Jail due to the deliberate indifference of the *Monell* Defendants. … However, under the particular circumstances of this case, the Court finds that this omission is not fatal to Plaintiff's *Monell* claims at the pleading stage**. "[E]vidence of a single violation of

5

federal rights can trigger municipal liability if the violation was a 'highly predicable consequence' of the municipality's failure to act." *Woodward v. Correctional Medical Services of Ill., Inc.*, 368 F.3d 917, 929 (7th Cir. 2004) (citing *Bd. of Cty. Comm'rs of Bryan Cty.*, 520 U.S. 397, 409 (1997)); *Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008) (noting "that it is not impossible for a plaintiff to demonstrate the existence of an official policy or custom by presenting evidence limited to his experience.").

In Woodward, the Seventh Circuit held that Correctional Medical Services could still be held liable under Monell for an inmate's suicide even though no previous suicides had occurred on CMS' watch. 368 F.3d at 929. The Court found that "there was a direct connection between inadequate CMS policies—not training its employees properly, permitting nurses not to completely fill out intake forms, allowing [the Doctor's] practice of not reviewing intake forms, and condoning [the Doctor's] resistance to putting inmates on suicide watch—and [the decedent's][ ] death." *Id.* at 928–29.

…

**Plaintiff alleges that the Monell Defendants acted with deliberate indifference by failing to institute, or condoning, the aforementioned practices or policies, and that Young's suicide was a result of that direct indifference. These specific allegations differentiate this case from others where plaintiffs have failed to tie the alleged policies or practices to their particular injury.**
*Young v. Peoria Cty., Illinois*, No. 1:16-CV-01367-JBM, 2017 WL 6418888, at *7-9 (C.D. Ill. Dec. 15, 2017)

### C. The Applicable Law As to Fourth Amendment Violations, and When Defendants Can Be Held Liable for Them

42 U.S.C. 1983 states, "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory … subjects, or causes to be subjected, any citizen of the United States … to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured …"

The Fourth Amendment protects Plaintiffs' curtilage from unreasonable *searches*; those searches are presumptively unreasonable without a warrant:

> Like the automobile exception, the Fourth Amendment's protection of curtilage has long been black letter law. "[W]hen it comes to the Fourth Amendment, the home is first among equals." *Florida v. Jardines,* 569 U.S. 1, 6, 133 S.Ct. 1409, 185 L.Ed.2d 495 (2013). "At the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.' " *Ibid.* (quoting *Silverman v. United States,* 365 U.S.

6

> 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961)). To give full practical effect to that right, the Court considers curtilage—"the area 'immediately surrounding and associated with the home' "—to be " 'part of the home itself for Fourth Amendment purposes.' " *Jardines,* 569 U.S., at 6, 133 S.Ct. 1409 (quoting *Oliver v. United States,* 466 U.S. 170, 180, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984)). "The protection afforded the curtilage is essentially a protection of families and personal privacy in an area intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened." *California v. Ciraolo,* 476 U.S. 207, 212–213, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986).
> 910 When a law enforcement officer physically intrudes on the curtilage to gather evidence, a search within the meaning of the Fourth Amendment has occurred. *Jardines,* 569 U.S., at 11, 133 S.Ct. 1409. Such conduct thus is presumptively unreasonable absent a warrant.

*Collins v. Virginia*, 138 S. Ct. 1663, 1670, 201 L. Ed. 2d 9 (2018)

Any warrantless entry into a private home, absent exigent circumstances, deprives a citizen of "rights, privileges, or immunities secured by the Constitution and laws." "A warrantless entry into a private home constitutes a search and presumptively is unreasonable under the Fourth Amendment." *Leaf v. Shelnutt*, 400 F.3d 1070, 1081 (7th Cir. 2005), citing *United States v. Rivera,* 248 F.3d 677, 680 (7th Cir.) (citing *Payton v. New York,* 445 U.S. 573, 585–86 (1980). A warrantless search is permissible " 'when police have a reasonable belief that exigent circumstances require immediate action and there is no time to secure a warrant.' " *Id.*, quoting *United States v. Lenoir,* 318 F.3d 725, 730 (7th Cir.). An example of a warrantless search is permitted based on exigent circumstances includes " 'when the police 'reasonably fear [ ] for the safety of someone inside the premises.' ' " *Id.*, quoting *United States v. Jenkins,* 329 F.3d 579, 581 (7th Cir.2003) (quoting *United States v. Richardson,* 208 F.3d 626, 629 (7th Cir.)). "To determine whether there were exigent circumstances, we must 'analyze the situation from the perspective of the officers at the scene' and must ask whether the officers had 'an objectively reasonable belief that exigent circumstances existed.' " *Id.*, quoting *United States v. Marshall,* 157 F.3d 477, 482 (7th Cir.).

Section 1983 liability is not vicarious – the defendant must be personally responsible for the deprivation of a constitutional right. *Chavez v. Illinois State Police,* 251 F.3d 612, 651 (7th Cir. 2001). "The law recognizes, however, that a defendant need not "participate[ ] directly in the deprivation' for liability to follow under § 1983." *Backes v. Vill. of Peoria Heights, Ill.*, 662 F.3d 866, 869–70 (7th Cir. 2011), quoting *Sanville v. McCaughtry,* 266 F.3d 724, 740 (7th Cir.2001). "Indeed, a supervisor may still be personally liable for the acts of his subordinates if he 'approves of the conduct and the basis for it.' " *Id.* at 870, quoting *Chavez*, 251 F.3d at 651. " '[S]upervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see. They must in other words act either knowingly or with deliberate, reckless indifference.' " *Id.*, quoting *Chavez*, 251 F.3d at 651 (quoting *Jones v. City of Chicago,* 856 F.2d 985, 992–93 (7th Cir.1988)). "A defendant 'will be deemed to have sufficient personal responsibility if he directed the conduct causing the constitutional violation, or if it occurred with his knowledge or consent.' " *Sanville*, 266 F.3d at 740, quoting *Chavez*, 251 F.3d at 652.

**D.     Plaintiffs Have More Than Sufficient Evidence Supporting the Allegations in Counts I and II**

Plaintiffs will discuss Defendants' evidence and arguments below. But before doing that, they will briefly remind the Court of the evidence they cited in their own motion for partial summary judgment on this issue.

**1.     Evidence of Searches of Plaintiffs' Property Without a Warrant**

There has been ample testimony regarding multiple instances in which Defendants entered into Plaintiffs' private home without a warrant. *See* Doc. 96, Ex. 1, Ceara Woody dep. at 77:19 to 78:22 (on May 27, 2015, she found three (3) members of the Granite City Fire Department on her property, after discovering the padlock on her gate had been broken, after her

8

husband had started a fire in their fire pit to make S'Mores); *id.* at 98:22 to 99:11 (in approximately 2009, she found Defendant Willaredt in her back yard, inside her fence).

*See also* Doc. 96, Ex. 1 at 193:5 to 194:11 (photographs attached to citations issued by Defendant Granite City could only have been taken from a carport area inside her property).

*See also* Doc. 96, Ex. 2, Michael Woody dep. at 17:5-19 (he and his wife Ceara resided at 3000 Dale at the times alleged in the operative complaint); *id.* at 31:24-32:12 (Plaintiff Tempest Horsley, his daughter, also lived there until 2015; Ceara owned the property); *id.* at 226:2-9 ("What parts of the property at 3000 Dale do you believe were illegally searched …? A. The carport, the back yard, the interior of the house.").

*See also* Doc. 96, Ex. 3, dep. of Defendant Birdsong at 38:4-19 (in 2011, he took pictures of the backyard of 3000 Dale to document alleged municipal violations, and did not have a warrant to do so; "But you didn't have a warrant to take pictures of 3000 Dale? A. No.").

*See also* Doc. 96, Ex. 4, dep. of Michael Nordstrom, testifying as a representative for Defendant Granite City, dep. at 5:24-7:7 (he was testifying as the representative of Granite City, specifically its police department); *id.* at 83:20-22 ("Q. Topic 24, if I understand correctly, there were no search warrants? A. Not to my knowledge, no, ma'am.").

*See also* Doc. 96, Ex. 5, dep. of Defendant Ralph Walden at 44:21-23 (regarding what he does if he has a complaint about a building without a permit: "Q. Do you get a warrant to enter the backyard? A. No."); *id.* at 46:19-47:1 ("Q. Okay. If there's no property owner there and you need to enter the garage, do you enter the garage? A. Yeah. Q. Okay. Do you get a warrant to enter the garage? A. No."); *id.* at 62:16-20 (" Q. You stated that you were photographing the property when Mr. Woody became belligerent towards you and began -- and began photographing you and telling you to stay off his property; is that correct? A. Yes.").

9

*See also* Doc. 96, Ex. 6, dep. of Defendant Stephen Willaredt on April 25, 2018, at 63:13-15, 64:4-6, 66:23-67:1, 69:23-70:1, 72:1-3, 72:19-23, 73:4-11, 74:7-13, 76:13-15 (describing multiple citations and photographs by the Granite City building and zoning department of the Plaintiffs' property that were issued or taken without a warrant); 70:2-7 (he has no idea how many times the Plaintiffs' property was photographed by the Granite City building and zoning department).

*See also* Doc. 96, Ex. 7, dep. of Defendant Granite City, represented by Stephen Willaredt on May 1, 2018 at 6:22-7:11 (testifying he was representing Granite City at this deposition); *id.* at 35:15-36:23, 38:22-24, 39:14-17, 39:21-40:11 (stating he was not aware of any warrants being issued before various photographs of Plaintiffs" property were taken); 39:18-20 (no warrant was ever issued to enter onto Plaintiffs' property).

Plaintiffs' evidence in support of Paragraph 17, which alleges that various defendants "broke into an RV on the Woody's property and took photographs of the RV and the property that they later attached to a citation, which was later dismissed," includes the following:

> Photographs containing images of the inside of 3000 Dale are on the City's server and in Defendant's possession. Defendants also took photos of themselves getting into the camper, crawling under the camper, and in one of the photos you can see a City employee squatting down trying to see through the barricade we had thrown together on the carport trying to keep them out. The gate lock was cut off, and the hardware was broken when we got back. Also, they took photos of tires that weren't there when we left, weren't there when we got back, have no idea where they came from, and we are pretty sure they brought them to stage in the photos. There is one photo of the back yard that they would have had to climb the south fence at the corner of the property to take. It shows the shed, and the cobb oven platform base we were building.

Ex. 2, Michael Woody's Verified Answers to Interrogatories, Answer to Int. 12

> 4. Identify all facts that support your contention that your backyard was searched on June 25, 2015.
>
> ANSWER: Photo taken from the SW corner of the backyard in the citations that they had to climb the fence to get. It is a photo of the peach, cherry trees, shed and

>the cobb oven platform we were building and the corner of the coop. there is no physical way to take that photo from any location except in the yard, as it is on the other side of a large elderberry thicket. Defendants also took photos of themselves getting into the camper after they removed the coverings, crawling under it, squatting down trying to peer through the barricade we put up around the carport, and photos of them standing in the driveway.

Ex. 3, Ceara Woody's Verified Answers to Interrogatories, Answer to Int. 4.

>5. Identify all facts that support the contention that the backyard at 3000 Dale Avenue was searched on June 25, 2015.
>
>ANSWER: The long grass, trash can and bad tag citations contain photographs of the backyard and the cobb oven platform we were building. The defendants climbed the fence on the south side of the yard to take the photo.

Ex. 2, Michael Woody's Verified Answers to Interrogatories, Answer to Int. 5.

Plaintiffs' evidence for Paragraph 19 that Plaintiffs' back yard had been searched and the garden and yard damaged, is supported by the following:

>4. Identify all facts that support your contention that your backyard was searched on June 25, 2015.
>
>ANSWER: Photo taken from the SW corner of the backyard in the citations that they had to climb the fence to get. It is a photo of the peach, cherry trees, shed and the cobb oven platform we were building and the corner of the coop. there is no physical way to take that photo from any location except in the yard, as it is on the other side of a large elderberry thicket. Defendants also took photos of themselves getting into the camper after they removed the coverings, crawling under it, squatting down trying to peer through the barricade we put up around the carport, and photos of them standing in the driveway.

Ex. 3, Ceara Woody's Verified Answers to Interrogatories, Answer to Int. 4.

>5. Identify all facts that support the contention that the backyard at 3000 Dale Avenue was searched on June 25, 2015.
>
>ANSWER: The long grass, trash can and bad tag citations contain photographs of the backyard and the cobb oven platform we were building. The defendants climbed the fence on the south side of the yard to take the photo.

Ex. 2, Michael Woody's Verified Answers to Interrogatories, Answer to Int. 5.

>*See also* Ex. 4, Ceara Woody dep. at 159- 170 (clarifying the correct date is August 5, 2015, and discussing 11 photographs that supported her allegation).

11

Plaintiffs' evidence for for Paragraph 14 that on June 1, 2015, one of plaintiff's chickens disappeared, and that these Defendants knew they had religious significance to Michael Woody, is supported by Michael Woody's uncontradicted testimony that this occurred after his home had been broken into, that nothing else was stolen from his home, it occurred after he had been embroiled in litigation with these Defendants over the issue of whether he could keep the chickens, local residents had indicated to him they were fine with the chickens, and shortly thereafter, someone from the City approached him about possibly creating a special use permit for the chickens. Ex. 6, Michael Woody dep. at 132-150. *See also* Ex. 4, Ceara Woody dep. at 132 (making the same point, that a chicken had gone missing after a break-in, but none of their stuff was stolen).

Defendants have claimed there is no evidence for Paragraph 20, that Plaintiffs' property was searched on June 30, 2015. But Exhibit 1, pages 4 and 6, reflect citations issued by the City that very day.

Setting aside the date of June 30, 2015, Plaintiffs have also furnished verified answers to interrogatories stating the interior of their home was searched on a different date, May 30, 2015, and explaining why they believe it was searched by the City. *See* Ex. 2, Michael Woody Ans. to Int. 12; Ex. 3, Ceara Woody Ans. to Int. 13. Plaintiffs have also testified to that effect. *See* Ex. 4, Ceara Woody dep. at 126-133 (describing the home being broken into on May 30, 2015, and testifying why she believed it was a City employee), Ex. 6 Michael Woody dep. at 132-150 (same).

For Paragraph 21, in which Plaintiffs allege that Ceara Woody was informed by an employee of the City of Granite City that there were photographs of the inside of her home, Plaintiffs' interrogatory answers and deposition testimony provide support. *See* Ex. 2, Michael

12

Woody Ans. to Int. 20, Ex. 3, Ceara Woody Ans. to Int. 13, Ex. 4, Ceara Woody dep. at 135-141 (describing a conversation with someone claiming to represent the City who described photographs she had seen of the interior of Plaintiffs' home); Ex. 6, Michael Woody dep. at 143-149 (describing the same conversation). Plaintiffs do not need to secure an admission from Defendants' employees to avoid summary judgment.

> **2. There has been no evidence suggesting there were "exigent circumstances" justifying these warrantless searches**
>
> **3. Evidence these warrantless searches were caused either by inadequate training by the City, or by affirmative policies by the City that encouraged them**

Plaintiffs have ample testimony that these searches occurred due to inadequate training of the City's employees, and/or affirmative policies by the City that encouraged the employees they could perform these warrantless searches. *See* Doc. 96, Ex. 1, Ceara Woody dep. at 47:2-53:21 (on September 8, 2011, two Granite City police officers (Patrolmen Donahey and Patrolman Roberts) advised her they had searched her property and that they did not need a warrant because they maintained the gates were not physically locked; she ultimately spoke to Defendant Wilaredt, and was advised that Granite City's Police Department was acting at the behest of its Building & Zoning Department); *id.* at 131:22 to 132:6 (the officers maintained they did not need a warrant for the search they had done); *id.* at 132:11-13 ("I took some pretty serious umbrage that they wandered around the property without my permission."); *id.* at 190:1 – 191:15 (in May of 2015, she went to the Police Department and asked them why her property kept getting searched without any warrants; the Police Department told her they did not need a warrant because she was committing municipal code violations).

*See also* Doc. 96, Ex. 2, dep. of Michael Woody at 114:1 –117:24 (in May of 2015, after he began to make S'mores, three Granite City firemen came onto his property claiming they

13

could be on his property without a warrant because someone had reported a fire, but there were no sirens, and they were not dressed for a fire); *id.* at 118:15-119:21 (reviewing a report by Granite City's fire department that documents this incident); *id.* at 178:21-179:1 (on March 4, 2016, he observed a Mr. Walden taking photographs of the property that could not be taken from the street); *id.* at 184:18-185:14 (discussing photographs of Mr. Walden illegally searching Plaintiffs' property on March 4, 2016); *id.* at 186:11-187:9 (discussing additional photographs of Mr. Walden from that date); *id.* at 189:4-194:23 (discussing a Granite City police report that refers to Plaintiff Michael Woody as the victim during this confrontation, as he was pushed or punched by Mr. Walden after he stated Mr. Walden could not be on his property without a warrant); *id.* at 212:3-6 (Plaintiffs had a fence that would section off their property); *id.* at 174:3-175:16 (when he told Mr. Walden he had to have a warrant to inspect the property, Mr. Walden replied, " 'I don't need a warrant. This is Granite City.' ").

There is ample evidence that the reason these violations occurred is because the City either did not train its employees in regard to when warrants were and were not needed, or had affirmative policies in effect that caused their employees to believe they could engage in this conduct without a warrant. *See, e.g.,* Ex. 8, Rule 30(b)(6) deposition of the City of Granite City, Willaredt dep. at 13 (he was prepared to testify about procedures and policies for the building and zoning department); *id.* at 17 ("Q. Let me have you turn your attention to topic No 9. Are there policies and procedures set forth in writing regarding the training of the members of the building and zoning department? A. No."); *id.* at 17 ("Q. Okay. Are there policies and procedures regarding the training of the members of the building and zoning department that are not in writing? A. No."); *id.* at 18 ("Q. Sure. Are there any informal systems or practices that the building and zoning department uses to train its employees? A. No."); *id.* at 18 ("Q. Okay.

Similarly, let me have you turn your attention to topic No. 10. And I believe you told me last week in your personal deposition that you received no training when you became administrator of the building and zoning department; is that correct? A. That is correct. Q. Okay. Is it fair to say then there are no policies and procedures that set forth the training of the administrator of the building and zoning department? A. You are correct.").

The City's representative confirmed that numerous photographs of the Plaintiffs' property were taken without a warrant, and that no warrant was obtained to enter the Plaintiffs' property to take those photographs. *See* Ex. 8, dep. at 36, 39, 40.

The City's other representative confirmed no warrants were ever obtained with regard to Plaintiffs' property. *See* Ex. 9, dep. at 5-6 (he was the representative for additional topics), *id.* at 83 (there were no search warrants); *id.* at 84 ("We don't have a policy or procedure that says this is how you get a search warrant.").

A reasonable inference from this evidence is that these warrantless searches occurred either because the City's employees either lacked training, or because they were advised they could perform these searches without a warrant.

Finally, Defendants contend they did not have a "policy" of harassing "undesirable citizens" out of the City. But setting aside the fact that it would be unlikely the City would put such a policy in writing, such that it would be unfair to require Plaintiffs to prove one exists, Defendants are not disputing that nearly all of the conduct Plaintiffs describe above occurred after they were engaged in litigation with the City regarding issues such as their exercise of their religious rights. A fact-finder could reasonably find that the City's actions were in retaliation against Plaintiffs for engaging in that litigation.

15

### 4. Defendants' Hearsay Arguments Are Without Merit

Surprisingly, in spite of all of this evidence, Defendants claim there has been no evidence of inadequate training, or policies that encouraged warrantless searches. Defendants, without specification, contend that five pages of testimony from Ceara Woody's deposition that Plaintiff is **not** citing above constitute inadmissible hearsay. The pages Defendants cite pertain to other persons who have told Plaintiff Ceara Woody they were harassed by the City and subject to warrantless searches. Those statements, which were elicited by Defendants' counsel, are not hearsay insofar as they show why these Plaintiffs believe they were the subject of retaliation, or that the City would not protect their constitutional rights. *See* Fed. R. Evid. 801 Advisory Committee Notes ("If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay."); *see also id.*, citing *Emich Motors Corp. v. General Motors Corp.*, 181 F.2d 70 (7th Cir. 1950), rev'd on other grounds 340 U.S. 558, (letters of complaint from customers offered as a reason for cancellation of dealer's franchise, to rebut contention that franchise was revoked for refusal to finance sales through affiliated finance company, were not hearsay).

Further, the testimony Plaintiffs cited above involve statements by a party opponent, such that they are not hearsay under Fed. R. Evid. 801(d)(2).

### 5. Plaintiffs Are Not Required to Show Multiple Incidents, Nor Must They Show Multiple Victims

Defendants also argue that a *Monell* claim for lack of training or inadequate policies requires more than a single incident. However, all of the case law set forth by Plaintiffs in Section I.B., *supra*, shows that is **not** required. Further, Plaintiffs have documented numerous incidents where warrantless searches occurred. There is no case law that states there must be multiple victims, and that it is insufficient if the same plaintiff is mistreated numerous times.

      **6.**    **The Evidence that Several Employees in Several Departments of the City Engaged in Numerous Acts Against Plaintiffs Over the Course of Several Years Supports an Inference of a Policy, Written or Unwritten, to Harass Plaintiffs and Deprive Them of Their Constitutional Rights**

Setting everything else aside, it ought to be telling that Defendants have collectively filed five dispositive motions, spanning dozens of pages, trying to convince the Court this is a simple matter subject to summary judgment. In these motions, there is a lot of finger-pointing, wherein numerous individuals in the zoning and police departments are suggesting that even if anyone did anything wrong, it was not them. The evidence details numerous violations of Plaintiffs' rights by a number of different individuals employed by the City of Granite City in multiple departments, across several years. All of that evidence supports a reasonable inference that the City had a policy, likely unwritten, to retaliate against Plaintiffs or, at a minimum, to use unconstitutional means if necessary to charge them with ordinance violations.

      **E.**    **Defendants' Motion Fails to Show How They Are Entitled to Judgment as a Matter of Law, When Defendants Fail to Identify Undisputed Evidence on an Affirmative Defense that Would Preclude Liability, and Fail to Address Most of the Allegations Directed at Them in Count IV**

Defendants' arguments as to the specific allegations referred to in their motion fail for the reasons set forth above. But beyond that, Defendants do not even attack the remaining allegations, including the specific allegations made in Count IV. In light of that, Defendants cannot possibly be entitled to summary judgment.

<h3 align="center">Conclusion</h3>

WHEREFORE, because there is at a minimum enough evidence to create an issue of fact as to Plaintiffs' allegations in Counts I and II, Defendants' motion for summary judgment must be denied.

Respectfully submitted,

ARMBRUSTER, DRIPPS, WINTERSCHEIDT & BLOTEVOGEL, LLC.

By: /s/ *Michael T. Blotevogel*_____
Roy C. Dripps #6182013
Charles W. Armbruster #6211630
Michael T. Blotevogel #6282543
51 Executive Plaza Court
Maryville, IL 62062
618/208-0320 Phone
800/927-1529 - Fax
royd@adwblaw.com
charles@adwblaw.com
mikeb@adwblaw.com
***ATTORNEYS FOR PLAINTIFF***

### Certificate of Service

The undersigned certifies that the foregoing document was served through this Court's CM/ECF system on February 4, 2019.

/s/ *Michael T. Blotevogel*_____