IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CEARA WOODY, MICHAEL WOODY, and TEMPEST HORNSLEY, | )<br>)<br>) |
| Plaintiffs, | )<br>) |
| vs. | ) Case No. 17-CV-534-SMY-RJD<br>)<br>) |
| CITY OF GRANITE CITY, ILLINOIS, STEVE WILLAREDT, in his individual and official capacity, JOHN BIRDSONG, in his individual and official capacity, DAVID HENN, in his individual and official capacity, RALPH WALDEN, in his individual and official capacity, CAPTAIN GAGICH, in his official capacity, LT. WERTHS, in his official capacity, PT. MANGIARACINO, in his official capacity, PT. DONAHEY, in his official capacity, SERGEANT WOJITOWICZ, in his official capacity, PT. HADLEY, in his official capacity, and PT. ROBERTS, in his official capacity, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | ) |

## **MEMORANDUM AND ORDER**

**YANDLE, District Judge:**

Plaintiffs Ceara Woody, Michael Woody, and Tempest Horsley bring this action alleging violations of 42 U.S.C. § 1983. Named as Defendants are Steve Willaredt, John Birdsong, David Henn, Rick Shelton, Ralph Walden (hereinafter the "Building and Zoning Defendants"), Capt. Gagich, Lt. Werths, Pt. Mangriaracino, Pt. Donahey, Sgt. Wojtowicz, Pt. Hadley, Pt. Roberts (hereinafter the "Police Defendants"), and the City of Granite City ("Granite City"). Plaintiffs assert the following causes of action in the First Amended Complaint:

Count I: A claim under 42 U.S.C. § 1983 for violations of Plaintiffs' Fourth and Fourteenth Amendments against the City of Granite City;

Count II: A claim under 42 U.S.C. § 1983 for violations of Plaintiffs' Fourth and Fourteenth Amendment rights against the Building and Zoning Defendants;

Count III: A claim under 42 U.S.C. § 1983 for violations of Plaintiffs' Fourth and Fourteenth Amendment rights against the Police Defendants;

Count IV: A claim under 42 U.S.C. § 1983 for violations of Plaintiffs' Fourth and Fourteenth Amendment rights against the Building and Zoning Defendants.

Now pending before the Court are Plaintiffs' Motion for Partial Summary Judgment (Doc. 96) and motions for summary judgment filed by the defendants (Docs. 86, 88, 90, 92, 94, 96). Responses have been filed to all motions (Docs. 100, 103-107). For the following reasons, Plaintiffs' Motion is **DENIED** and Defendants' motions are **GRANTED**.

### Factual Background

At all relevant times, Plaintiffs Ceara Woody, Michael Woody, and Tempest Horsley resided at 3000 Dale Avenue, Granite City, Illinois (the Property). Plaintiffs assert that the City of Granite City (Granite City), the Police Defendants, and the Building and Zoning Defendants violated their civil rights on numerous occasions by trespassing and searching the Property without a warrant, stealing a chicken, and generally harassing, stalking and threatening Plaintiffs (Doc. 33). The alleged violations include a search in 2008, a search of the backyard in 2009, a search of the carport and backyard in 2011, a search of the backyard by the Granite City Fire Department on May 27, 2015, the disappearance of a chicken on May 30, 2015, a search by the Police Department in June 30, 2015, and a search by the Building Department in March 2016:

### *2008 to 2014*

Ceara Woody received photographs mailed to her in a warning letter in August 2008 (Doc. 96-1, at p. 193). She found Defendant Steve Willaredt in her backyard in 2009. *Id*. at pp. 98-99.

During her deposition, Ceara Woody testified that an alleged warrantless search in occurred in September 2011 following street repairs performed in front of the Property. Specifically, the Granite City Street Department was on Dale Avenue repairing a large hole and reported to the Police Department and Building and Zoning that there were numerous chickens observed on the Property (Doc. 96-1, p. 48). Plaintiffs were on vacation. *Id*. at p. 47.

Defendants Donahey and Roberts returned to the Property on September 9, 2011. *Id*. Michael Woody answered the door and was given a citation for having chickens on the Property in violation of Granite City ordinances. *Id.* The Woodys called the Building and Zoning Department for clarification of the citation and spoke to Defendant Willaredt. *Id*. at p. 50. According to Plaintiffs, Willaredt yelled belligerent and racist comments during the conversation. *Id*. Ceara Woody ended the conversation stating "well, then, I guess we will just see you in court." *Id*. at p. 53. The Woodys litigated the 2011 citation in municipal and state court.

Ceara Woody contacted the Granite City Police Department's non-emergency phone number on multiple occasions to ask why her property kept getting searched without warrants (Doc. 89-18, p. 191). She did not make any additional reports to the Police Department after 2013 because "it became obviously futile by the time 2013 rolled around. So, there was no point." *Id*. at p. 191.

*May 27, 2015*

An individual called the Granite City Police Department on May 27, 2015 and reported that "there are some people down on Dale Avenue. I mean it is just rolling smoke. I though the house was on fire at first, but they are out back burning trash and all kinds of crap and it is really annoying all the neighbors around here." (Doc. 100-6). The caller estimated the fire to be located

at 2920 Dale and stated "It is 2920 I think is the house number. You can't miss it. You will see all the smoke." *Id.*

Firefighters reported to 2920 Dale Avenue and noticed smoke rising from another property further down Dale Avenue (Docs. 100-H, 100-I). They proceeded to 3000 Dale Avenue. *Id*. The firefighters entered the Property to investigate the source of the smoke and to contact the property owners about the fire. *Id*. The firefighters approached the side door located in the carport to knock. *Id*. Ceara Woody testified that she found the firefighters on her Property after discovering the padlock on her gate had been broken (Doc. 96-1, pp. 77-78). She demanded to see a warrant and requested that they leave. *Id*. The firefighters told the Woodys that the fire was not legal and needed to be extinguished (Doc. 100-9). Michael Woody extinguished the fire and the firefighters cleared the scene and left the Property. *Id*.

### *May 30, 2015*

The Woodys took a camping trip to Carlyle Lake on the morning of May 30, 2015 (Doc. 104-4, p. 126). They decided to return home that same day due to rain. *Id*. They returned home in the afternoon and found the front door to their home open. *Id*. Ceara Woody noticed that furniture had been moved and bedroom doors were open. *Id*. at p. 128. Drawers in the bedrooms were pulled out. *Id*. The Woodys went into the backyard and noticed that one of their thirteen chickens was missing. *Id*. at p. 130. Other than the chicken, nothing was taken from the Property. *Id*. at p. 132. Ceara Woody believes an employee of Granite City searched her home that day. *Id*. at p. 133.

### *June 30, 2015*

Defendants Gagich and Werths were assigned to a special division within the Granite City Police Department that enforced the Granite City Crime-Free Multi-Family Housing ordinances.

The division was responsible for enforcing code violations (Doc. 91-5, p. 46). Gagich and Werths were working nuisance abatement along Dale Avenue in Granite City on June 15, 2015 (Doc. 91-2, pp. 64). The Granite City Police Department had received nuisance complaints about Dale Avenue properties and were asked to check it out (Doc. 91-5, p. 58). While on foot patrol, Gagich and Werths observed multiple municipal ordinance violations at the Property including an inoperable travel camper, long grass and weeds growing on the south side of the Property, debris laying in the yard near the driveway, and overgrown bushes and plants that were impeding the public sidewalk. *Id*. at p. 65. The travel camper was parked on the driveway in front of the enclosed carport. *Id*. The driveway runs from the public street along the north side of the Property to a carport attached and adjacent to the Property on the northside. *Id*. The carport was covered by a makeshift bamboo privacy screen. *Id*. The camper appeared to be partially dismantled and was loosely covered with tarps. *Id*.

Michael Woody sold the camper on June 25, 2015, and it was in the driveway awaiting removal by the new owner on June 30, 2015 (Doc. 82). On that day, the officers knocked on the door, but no one answered. *Id*. The officers noted that the camper violated Granite City Ordinance No. 8.42.010 which prohibited the parking of inoperable vehicles on private property. *Id*. Gagich looked for a license plate for the camper while Werths took photographs of the violations. *Id*. at p. 80-89. One of the photographs taken by Werth depicted the inside of the camper. *Id*. Werth took the photograph by placing the camera underneath the tarp. *Id*. He testified that he was looking for weathering and if the camper was inoperable "so I reached under to see if there's any damage from weathering coming through the gap." *Id*. at p. 117. The officers did not have a search warrant. *Id*. at p. 119-120. After taking the photographs, Gagich and Werths continued their patrol of Dale Avenue. *Id*.

*March 4, 2016*

On March 4, 2016, Defendant Ralph Walden was performing a new rental inspection for Barry Spicer, the owner of the home neighboring Plaintiffs' Property (Doc. 100-10, pp. 91-92). During the inspection, Spicer complained about a stove pipe sticking off the Property onto Spicer's property and other possible code violations, and asked Walden to do something about the violations (Doc. 100-11, pp. 91-92).

Michael Woody heard his dog barking and went to answer the door (Doc. 96-2, p. 174). Walden introduced himself to Woody as an employee of the Granite City Building and Zoning Department. *Id*. Walden stated that he was looking at the apartment next door to the Property and noticed that the backyard was a mess. *Id*. Woody responded that he planned on cleaning the backyard. Woody testified that Walden got irate and stated that he was going into the backyard of the Property to take photographs. *Id*. at p. 175. Woody responded that Walden was not going into his backyard without a search warrant and shoved the door in his face. *Id*. Walden returned to Spicer's backyard and photographed the stove pipe that was sticking out of the side of the Plaintiffs' carport and extending over onto Spicer's property (Doc. 100-10, pp. 180-181). Walden also took photographs of the condition of Plaintiffs' backyard which was visible from Spicer's yard. *Id.*; *see also* Doc. 100-11, pp. 41-42. Spicer testified that the stovepipe and other violations were visible from his yard. *Id*.

Woody walked around to the side of his carport and saw Walden in his neighbor's backyard taking pictures of the Property (Doc. 96-2, p. 175). Woody asked Walden to stop taking pictures of his yard without a search warrant. *Id*. at pp. 178-179. Woody began taking photographs of Walden as Walden left the neighbors' property. *Id*. According to Woody, Walden told Woody that he had no right to take his picture and the two got into a physical altercation. *Id*. Woody told

Walden that he was calling the police. *Id*. Walden left after waiting for the police for about 20 minutes. Woody called the police and Defendant Mangiaracino responded to the scene. *Id*. at p. 181.

Mangiaracino took Woody's statement and reviewed the photographs Woody had taken of Walden (Doc. 89-21, p. 17). Woody told Mangiaracino that he was not injured. *Id*. Mangiaracino did not notice any physical evidence of an attack. *Id*. He went to the Building and Zoning office to speak with Walden and Walden's supervisor, Defendant Steve Willaredt. *Id*. at pp. 17-19. Walden denied any physical altercation occurred. *Id*. Mangioracino completed a police report but ultimately decided that an arrest was not warranted. *Id*.

## Legal Standard

Summary judgment is proper only if the moving party can demonstrate that there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). The moving party is entitled to summary judgment where the non-moving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex,* 477 U.S. at 323. If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50 (1986). Any doubt as to the existence of a genuine issue of material fact must be resolved against the moving party. *Lawrence v. Kenosha County,* 391 F.3d 837, 841 (7th Cir. 2004).

## Discussion

Plaintiffs move for partial summary judgment against Defendants Granite City, Willaredt, Birdsong, Donahey, and Walden, asserting these defendants violated their rights by engaging in warrantless entries onto Plaintiffs' Property (Doc. 96). Defendants move for summary judgment,

claiming that some of Plaintiffs' claims are outside the applicable statute of limitations (Doc. 86). The Building and Zoning Defendants move for summary judgment as to Plaintiffs' Fourth and Fourteenth Amendment individual and official capacity claims against them (Counts II and IV) (Docs. 92 and 94). The Police Defendants move for summary judgment on Plaintiffs' Fourth and Fourteenth Amendment claims against them in Count III (Docs. 88 and 90). Finally, Granite City moves for summary judgment as to Plaintiffs' municipal liability claim against it in Count I (Doc. 92).

## Statute of Limitations

As an initial matter, the Court must address the timeliness of Plaintiffs' claims. A court may grant summary judgment based on a statute of limitations if (1) the statute of limitations has run, thereby barring the plaintiff's claim as a matter of law, and (2) there exist no genuine issues of material fact regarding the time at which plaintiff's claim has accrued and the application of the statute to the plaintiff's claim which may be resolved in the plaintiff's favor. *Massey v. United States*, 312 F.3d 272, 276 (7th Cir. 2002).

The statute of limitations for claims under § 1983 is borrowed from state law and, in Illinois, is two years. *Moore v. Burge,* 771 F.3d 444, 446 (7th Cir. 2014). The date on which the claim accrues and thus starts the running of the limitations period is a matter of federal law, and generally occurs when a plaintiff knows or should know that his or her constitutional rights have been violated. *Moore,* 771 F.3d at 447. To determine when the claim accrues, the Court must first identify the injury and next, "…must determine the date on which the plaintiff could have sued for that injury." *Hileman v. Maze*, 367 F.3d 694, 696 (7th Cir. 2004).

The alleged warrantless searches of Plaintiffs' Property occurred in 2008, 2009, 2011, on May 27, 2015, June 2015, and in March 2016. Plaintiffs were aware of the alleged warrantless

searches on each of these dates but did not file this lawsuit until May 19, 2017 (*see* Doc. 1). While Plaintiffs acknowledge they have pleaded claims arising before May 19, 2015, the argue that the statute of limitations is inapplicable because the pre-May 2015 allegations are part of a continuing violation.

The phrase "continuing violation" is ambiguous. *United States v. Midwest Generation, LLC*, 720 F.3d 644, 646 (7th Cir. 2013). "It may mean any of at least three things: (1) ongoing discrete violations; (2) acts that add up to one violation only when repeated; and (3) lingering injury from a completed violation." *Id., citing Turley v. Rednour*, 729 F.3d 645, 654 (7th Cir. 2013) (Easterbrook, J., concurring). The Seventh Circuit has applied the continuing violation doctrine when the plaintiff could not reasonably be expected to perceive the alleged violation before the limitations period has run, or when the violation only becomes apparent in light of later events. *See Hardin v. S.C. Johnson & Son, Inc.,* 167 F.3d 340, 344 (7th Cir. 1999); *Dasgupta v. Univ. of Wisconsin Bd. of Regents,* 121 F.3d 1138, 1139 (7th Cir. 1997). The doctrine also applies when a state actor has a policy or practice that brings with it a fresh violation each day. *Reese v. Ice Cream Specialties, Inc.,* 347 F.3d 1007, 1012–14 (7th Cir. 2003); *Bazemore v. Friday*, 478 U.S. 385, 395-96 (1986) (noting that "[e]ach week's paycheck that delivers less to a black than to a similarly situated white is a wrong actionable under Title VII, regardless of the fact that this pattern was begun prior to the effective date of Title VII."). A lingering consequence from a discrete act, however, does not extend the period of limitations. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).

In this case, Ceara Woody testified that she attempted to explain to Defendant Willaredt that her rights were being violated after the 2011 search that resulted in the Plaintiffs receiving an ordinance violation. After receiving no traction with Willaredt, Ceara Woody ended the call

stating that she would "see him in court". The Woodys subsequently initiated a state court action. These facts do not trigger the continuing violation doctrine. The alleged searches – occurring in 2008, 2009, 2011, 2015, and 2016 – are not the type of frequent ongoing "fresh violations" contemplated by the doctrine. Nor were the alleged searches such that Plaintiffs could not reasonably be expected to perceive them as constitutional violations before the limitations period ran or that they only became apparent in light of later events. Rather, Plaintiffs have alleged isolated instances of warrantless searches of their Property. Thus, they could have filed suit after each alleged illegal search. *Dominguez v. Hendley*, 545 F.3d 585, 589 (7th Cir. 2008) (The § 1983 claim under the Fourth Amendment for unlawful search or seizure is untimely because it accrues "at the time of (or termination of) the violation).

The undisputed facts establish that the claims arising prior to May 19, 2015 are barred by the statute of limitations. Accordingly, Defendants' Motion (Doc. 86) is **GRANTED** as to Plaintiffs' claims against Defendants Birdsong, Henn, Donahey, Wojitowicz, Hadley, and Roberts.

**Fourth Amendment Claims**

The Fourth Amendment, made applicable to the States by the Fourteenth Amendment, provides in relevant part that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." U.S. Const. amend IV. Curtilage "is the area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life,' *Boyd v. United States,* 116 U.S. 616, 630 (1886), and therefore has been considered part of home itself for Fourth Amendment purposes. *Siebert v. Severino,* 256 F.3d 648, 653–54 (7th Cir. 2001) ("Both a home and the home's curtilage—*i.e.,* 'the area outside the home itself but so close to and intimately connected with the home and the activities that normally go on there that it can reasonably be considered part of the

home'—are within the scope of the Fourth Amendment's protection .") (quoting *United States v. Shanks,* 97 F.3d 977, 979 (7th Cir. 1996)).

Once it is established that the government physically entered a constitutionally protected area, the remaining question is whether the government had an explicit or implicit license to be there. An implicit license exists where the property owner's actions establish an implied invitation for visitors to enter private property, based on local habits or customs. *Jardins*, 569 U.S. at 7-8. "The scope of a license—express or implied—is limited not only to a particular area but also to a particular purpose." *Id.* at 9. A search occurs if the government trespasses onto constitutionally protected property without a license (explicit or implicit) or a warrant in order to obtain information. Administrative inspections are searches within the meaning of the Fourth Amendment. *Montville v. Lewis*, 87 F.3d 900, 902 (7th Cir. 1996); *Camara v. Mun. Ct. of City and Cty. of S.F.*, 387 U.S. 523, 540 (1967).

It is well established, however, that Fourth Amendment protections do not apply to areas or articles not within the individual's reasonable expectation of privacy. An individual can invoke the Fourth Amendment's protections only by satisfying a "twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'" *Katz v. United States,* 389 U.S. 347, 361 (1967) (Harlan, J., concurring). "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Id.* at 351. For example, an individual does not have an expectation of privacy from a police helicopter flying over his greenhouse, even when he has taken great pains to hide the greenhouse by enclosing it on two sides, obscuring 80% of the roof, and hiding it from view on the other sides with trees, shrubs, and his nearby home. *United States v. Contreras,* 820 F.3d 255, 261 (7th Cir. 2016). Nor do the police

violate the Fourth Amendment by viewing anything in plain sight "from a public vantage point where they have a right to be," *Riley,* 488 U.S. at 448, 449. Police officers may walk up to any part of private property that is otherwise open to visitors or delivery people. *United States v. LePage,* 477 F.3d 485, 488 (7th Cir. 2007). With these principles in mind, the Court addresses the legality of the June 30, 2015 and March 6, 2016 searches of Plaintiffs' Property.[1]

### *June 30, 2015*

As an initial matter, Plaintiffs assert that the June 30, 2015 search was performed by both the Building and Zoning Defendants and the Police Defendants. The undisputed facts, however, establish that this search was conducted solely by Defendants Gagich and Werths of the Granite City Police Department. Therefore, Plaintiffs' claims against the Building and Zoning Defendants related to this search are subject to summary dismissal.

With respect to the Police Defendants, the undisputed facts establish that officers Gagich and Werths observed municipal ordinance violations from their vantage point on the public sidewalk. The violations were in plain view and included an inoperable travel camper, long grass and weeds growing on the south side of the Property, debris laying in the yard near the driveway, and overgrown bushes and plants that were impeding the public sidewalk. As such, the officers' visual observations did not constitute a search and the officers did not need a warrant to view and photograph the exterior of Plaintiffs' Property. *See Davis v. Chalstrom*, 595 F. App'x 627, 630 (7th Cir. 2014) (a government agent is permitted to enter the curtilage of the home in the same

---

[1] Plaintiffs allegations against the Fire Department are not properly before the Court because Plaintiffs have not named either the Fire Department or the individual firefighters involved in the May 25, 2016 incident as defendants in this lawsuit. Moreover, exigent circumstances existed for the May 25, 2016 alleged search because the firemen were dispatched to the Property after a citizen complaint of a burning fire on the premises. *See Michigan v. Tyler,* 436 U.S. 499, 509 (1978) (law enforcement officers may make a warrantless entry onto private property to fight a fire and investigate its cause)

way that any delivery person or passerby could: the agent may approach any entrance to the house that is open to visitors (even if it is not the front door) and make warrantless observations of the exterior); *Kyllo v. United States*, 533 U.S. 27, 32 (2001).

That said, the inspection of the camper in Plaintiffs' driveway requires additional analysis. To inspect the camper, the officers walked up the driveway, looked under the camper for a license plate, and Werths took a photograph of the inside of the camper by placing the camera underneath the tarp. Plaintiffs maintain that the camper was in the curtilage of their Property and, therefore, the search of the camper was illegal. Determining whether an area around the home is curtilage requires a fact-intensive inquiry. The Court must consider, "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." *United States v. Dunn,* 480 U.S. 294, 301 (1987).

Here, the proximity of the driveway to the home weighs in Plaintiffs' favor. But this factor alone does not suffice to establish that an area is within the curtilage. *United States v. French,* 291 F.3d 945, 952 (7th Cir. 2002). Significantly, the camper was not in an enclosure, but merely on the driveway. Michael Woody did not own the camper because he had sold it a few days prior and was only storing it temporarily for the new owner. The new owner was using the driveway to make repairs to the camper. Thus, the driveway was not an area where Plaintiffs' intimate activities of home-life were carried out. *See Bleavins v. Bartels,* 422 F.3d 445, 454-55 (7th Cir. 2005) (noting that an area utilized for storage and parking is not considered an area intimately connected with the activities of the home). Finally, the driveway and the camper were completely viewable by the public. While the camper had tarps over it on one side, the rest of the camper was

visible from the public street. Weighing the totality of the *Dunn* factors, the Court finds that the camper was outside the curtilage of Plaintiffs' home.

Plaintiffs cite to *Collins v. Virginia,* 138 S.Ct. 1663 (2018) in support of their argument that the camper was in the curtilage. In *Collins*, the Supreme Court held that a driveway enclosure where a police officer conducted a warrantless search of a motorcycle was "an area adjacent to the home and to which the activity of home life extends, and so is properly considered curtilage." *Id* at 1671. The Court further found that the automobile exception did not justify the invasion of the curtilage:

> Applying the relevant legal principles to a slightly different factual scenario confirms that this is an easy case. Imagine a motorcycle parked inside the living room of a house, visible through a window to a passerby on the street. Imagine further that an officer has probable cause to believe that the motorcycle was involved in a traffic infraction. Can the officer, acting without a warrant, enter the house to search the motorcycle and confirm whether it is the right one? Surely not.

*Collins,* 138 S. Ct. at 1671.

Here, unlike in *Collins*, the camper was not in an enclosed area.

Moreover, Defendants Gagich and Werths are entitled to qualified immunity for their inspection of the camper. Qualified immunity shields government officials performing discretionary functions from civil litigation. *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). When determining whether a public official is entitled to qualified immunity in a § 1983 action, courts undertake a two-prong inquiry. *Tolan v. Cotton*, 572 U.S. 650, 656 (2014); *Borello v. Allison*, 446 F.3d 742, 746 (7th Cir. 2006). The first prong raises the question as to whether the facts show the violation of a constitutional right (here, the Fourth Amendment). *Id.* The second prong asks whether a plaintiff's constitutional rights were clearly established at the time of the officers' actions. *Id*. In this case, that determination depends on whether the state of the law gave

Gagich and Werths fair warning that the warrantless search of the camper in the driveway was unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

A right is clearly established if a "court has upheld the purported right in a case factually similar to the one under review, or that the alleged misconduct constituted an obvious violation of a constitutional right." *Wernsing,* 423 F.3d at 742. As the Supreme Court has explained, "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Hope,* 536 U.S. at 739. (citations omitted).

The state of the law at the time Officers Gagich and Werths inspected the camper was such that a driveway was not considered curtilage. *See Bleavins v. Bartels,* 422 F.3d at 454-55 (generally, there is no expectation of privacy in a driveway, particularly where it is open to observation and use by the public); *United States v. Evans,* 27 F.3d 1219, 1228–29 (7th Cir. 1994) (collecting cases including *United States v. Humphries,* 636 F.2d 1172, 1179 (9th Cir. 1980) (finding no reasonable expectation of privacy that would preclude officer from entering driveway to check on the license plate number of parked car where an automobile was parked in driveway visible from street and driveway was not enclosed),*cert. denied,* 451 U.S. 988 (1981)). As such, there could be no apparent unlawfulness associated with their actions, and they are therefore entitled to summary judgment as to Plaintiffs' Fourth Amendment claims in Count III.

### *March 4, 2016*

On March 4, 2016, Defendant Walden was performing a new rental inspection for Barry Spicer, the owner of the home neighboring Plaintiffs' property, when Spicer complained about possible code violations at the Property and asked Walden to do something about the violations. After receiving permission from the Spicer, Walden took photographs of conditions that

undisputedly were plainly visible to Walden from Spicer's backyard. Walden did not physically intrude onto Plaintiffs' Property to take the photographs. As such, no Fourth Amendment violation occurred as a matter of law, and Walden is entitled to summary judgment as to Plaintiffs' Fourth Amendment claims in Counts II and IV.

## Fourteenth Amendment Equal Protection Claim

Plaintiffs allege that Defendants "violated their civil rights secured though the Fourth and Fourteenth Amendments through continuous harassment – including following the Plaintiffs, repeatedly entering the Property without a warrant, numerous baseless citations, physical assault by Defendant Walden, damage to property, and other actions." Plaintiffs further claim that Defendants "intentionally violated Plaintiffs' civil rights due to racial animus" and as "retribution for Michael Woody's successful religious liberties litigation against Granite City". To the extent that Plaintiffs' are asserting an equal protection claim, Defendants are entitled to summary judgment.

Courts have consistently held that allegations of stalking, harassment, offensive language, and even threats by a public official are legally insufficient to support an equal protection or other constitutional claim under § 1983. *See, e.g., DeWalt v. Carter,* 224 F.3d 607, 612 and n.3 (7th Cir. 2000) ("Precedent from this circuit as well as others" demonstrates that "simple verbal harassment" does not constitute an equal protection violation, or otherwise "violate the Constitution") (citing cases); *Williams v. Farmer*, 2013 WL 1156426, at *4-5 (N.D. Ill. Mar. 20, 2013) (allegations that officer ex–husband was "following and stalking" plaintiff "fall short of stating a constitutional claim" necessary for liability under § 1983). To succeed on a class-of-one equal protection claim, a plaintiff must show that "state actors lacked a rational basis for singling them out for intentionally discriminatory treatment." *Miller v. City of Monona,* 784 F.3d 1113,

1121 (7th Cir. 2015). "Normally, a class-of-one plaintiff will show an absence of rational basis by identifying some comparator - that is, some similarly situated person who was treated differently." *Fares Pawn LLC v. Ind. Dep't of Fin. Insts.,* 755 F.3d 839, 845 (7th Cir. 2014). Lacking a comparator is not fatal, *see City of Monona,* 784 F.3d at 1120, as long as a plaintiff can "prove[ ] by evidence that the defendant deliberately sought to deprive [the plaintiff] of the equal protection of the laws for reasons of a personal nature unrelated to the duties of the defendant's position." *Scherr v. City of Chicago,* 757 F.3d 593, 598 (7th Cir. 2014) (quoting *Hilton v. City of Wheeling,* 209 F.3d 1005, 1007–08 (7th Cir.2000)).

Plaintiffs have failed to make out a requisite *prima facie* case. There is no evidence establishing that they were singled out or that similarly situated individuals were treated differently by the defendants. There is also no evidence that Defendants damaged their property or harassed and stalked Plaintiffs. Although Ceara Woody testified that she believed a Granite City employee stole her chicken, there is no evidence to support her belief. Mere speculation is not enough to survive a motion for summary judgment.

Here, there was a rational basis for Defendants' actions – citizen complaints and obvious ordinance violations. Although Plaintiffs believe Defendants' actions, whether in the form of prosecution or otherwise, were a spiteful effort to 'get' Plaintiffs for reasons wholly unrelated to any legitimate state objective, there is no evidence from which Plaintiffs can ultimately prove that belief to be true. *See Esmail v. Macrane,* 53 F.3d 176, 180 (7th Cir. 1995). Conversely, Defendants have established that there was a conceivably rational purpose behind their actions, and therefore are entitled to summary judgment on Plaintiffs' Fourteenth Amendment claims. *See Fares Pawn,* 755 F.3d at 845 ("If we can come up with a rational basis for the challenged action, that will be the end of the matter-animus or no.").

**Failure to Intervene**

Plaintiffs also argue that the Police Defendants are liable for failing to intervene and prevent Fourth Amendment violations by Granite City and the Building and Zoning Defendants. Generally, § 1983 does not allow actions against individuals merely because of their supervisory authority, but instead requires that a defendant cause the deprivation at issue. *Palmer v. Marion County,* 327 F.3d 588, 594 (7th Cir. 2003). However, omissions may violate civil rights, and under certain circumstances, a state actor's failure to intervene to prevent another's Fourth Amendment violation renders her culpable under § 1983. *Yang v. Hardin,* 37 F.3d 282, 285 (7th Cir. 1994). This typically arises in the context of excessive force claims against police officers (when a police officer, who is *present* and fails to intervene to prevent a fellow officer from depriving a citizen of his constitutional rights, the officer can be liable if he had reason to know that excessive force was being used and if he had a reasonable opportunity to prevent the harm from occurring, *Yang,* 37 F.3d at 285; *Abdullahi v. City of Madison,* 423 F.3d 763, 774 (7th Cir. 2005)). The failure to intervene does not however impose liability for failing to prevent (or predict) constitutional violations that may occur some time in the future. *Abdullahi,* 423 F.3d at 774 (failure to intervene claim requires proof that standby officer "had reason to know" that excessive force was being used). Plaintiffs contend the Police Defendants had a realistic opportunity to stop the unconstitutional behavior and did not. But there is no evidentiary support for this contention.

Plaintiff's also assert that "at the pleading stage, [they] are required to do nothing more to state a claim for failure to intervene by the police" and they have alleged that they had to move out of their home because no one was stopping the harassment. This argument is without merit. At the summary judgment stage, Plaintiffs must go beyond the pleadings and identify specific evidence creating a genuine material issue for trial.

There is simply no evidence to support Plaintiffs' failure to intervene claim. Plaintiffs never contacted the police department during the relevant period at issue in this lawsuit. Tempest Horsley-Harvey testified that she never contacted the Police Department in relation to any of the events in this lawsuit. Ceara Woody testified that she did not contact the Police Department after 2013. Michael Woody testified that he only contacted the Police Department on one occasion following the incident with Walden in March 2016. As a result of that contact, Defendant Mangioracino responded to the scene, interviewed the parties involved, completed a police report and determined that an arrest was not warranted based on the evidence. Accordingly, Defendants are entitled to summary judgment on Plaintiffs' failure to intervene claim in Count III.

## *Monell* Claim

Plaintiffs claim that Granite City, thru the Building and Zoning Defendants, had a custom and policy of harassing residents until they moved out of the city. Plaintiffs also claim that Granite City had a policy that allowed its officials to engage in widespread searches of private property without a warrant.

A municipality cannot be held liable for the actions of individual employees under § 1983 based on a theory of *respondeat superior*. *Monell v. Department of Soc. Servs. of the City of New York,* 436 U.S. 658, 691 (1978). But a plaintiff can establish municipal liability under § 1983 by proving (1) the existence of "an express policy that, when enforced, causes a constitutional deprivation"; (2) the existence of "a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law"; or (3) an act of a "person with final policymaking authority" that causes a constitutional injury. *Roach v. City of Evansville,* 111 F.3d 544, 548 (7th Cir. 1997); see also *Glisson v. Indiana Dep't of Corr.,* 849 F.3d 372, 379 (7th Cir. 2017), *cert. denied sub nom. Corr.*

*Med. Servs., Inc. v. Glisson*, 138 S. Ct. 109, 199 L. Ed. 2d 30 (2017). A municipality is liable only when its "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy," is the moving force behind the constitutional violation. *Monell*, 436 U.S. at 694. In other words, there must be a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton, Ohio v. Harris,* 489 U.S. 378, 385 (1989).

There is no evidence in this case that an express policy or action by a person with final policymaking authority caused Plaintiffs a constitutional injury. Likewise, there is no evidence in the record to support a claim that Granite City is liable due to a widespread practice of warrantless searches. As previously noted, the searches at issue were valid under the Fourth Amendment, and therefore, Plaintiffs did not suffer a constitutional deprivation at the hands of either the Building and Zoning Defendants or the Police Defendants. Therefore, Defendant Granite City is entitled to summary judgment on Count I of Plaintiffs' Amended Complaint.

## Conclusion

For the foregoing reasons, Plaintiffs' Partial Motion for Summary Judgment is **DENIED** and Defendants' motions for summary judgment are **GRANTED** in their entirety. The Clerk of Court is **DIRECTED** to enter judgment accordingly. All pending motions are **TERMINATED** as **MOOT**.

**IT IS SO ORDERED.**

**DATED: March 25, 2019**

**s/ Staci M. Yandle**
**STACI M. YANDLE**
**United States District Judge**
